AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

### for the
### Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| | ) | |
| TREVOR DANIEL JACOB, an individual. | ) | Case No.   2:22-MJ-02974 |
| | ) | |
| | ) | |
| | ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 32(a) | Destruction of aircraft or aircraft facilities |
| 18 U.S.C. § 1001 | False statement |
| 18 U.S.C. § 1505 | Obstruction of proceedings before departments, agencies, and committees |
| 49 U.S.C. § 1155(b) | Aviation penalties |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of_____days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Cristina Jones*

*Applicant's signature*

Cristina Jones, Special Agent, Office of Inspector General, U.S. Department of Transportation

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

*Judge's signature*

City and state: Los Angeles, CA_____     Hon. Steve Kim, U.S. Magistrate Judge

*Printed name and title*

AUSA:  Dennis Mitchell, x12484

**ATTACHMENT A**

DESCRIPTION OF THE PERSON TO BE SEARCHED

THE PERSON TO BE SEARCHED IS TREVOR JACOB ("JACOB") whose year of birth is 1993.  JACOB is further described as an adult male with brown hair and green eyes, and his weight and height are further described as 180 pounds and six feet tall.  JACOB has California Driver License number XXXX8422.  A close-up photo of JACOB's face and a still image of JACOB in an airplane are shown on the next page.  For purposes of this warrant the search of JACOB shall include JACOB'S clothing and personal belongings, including any backpacks, wallets, briefcases, and bags that are within JACOB's immediate vicinity and control at the location where the search warrant is executed.





**ATTACHMENT B**

LIST OF ITEMS TO BE SEIZED

    1.   The Items To Be Seized are evidence, contraband, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 32 (destruction of aircraft or aircraft facilities), 1001 (false statement), 1505 (obstruction of proceedings before departments, agencies, and committees), and Title 49, United States Code, Section 1155(b) (aviation penalties) and consist of an iPhone 12 Pro with International Mobile Equipment Identity (IMEI) number 3509058239557400 (the "SUBJECT DEVICE"), and the following items that are located on the SUBJECT DEVICE:

    a.   All documents, data, and/or records pertaining to a 1940 Taylorcraft, BL-65 aircraft with Civil Registration Number N29508.

    b.   All documents, data, and/or records pertaining to the aircraft crash or accident involving the aircraft associated with Civil Registration Number N29508 on or about November 24, 2021.

    c.   All documents, data, and/or records pertaining to FAA and/or NTSB regulations.

    d.   All documents, data, and/or records constituting or pertaining to JACOB's pilot logbooks for year 2021.

    e.   All documents, data, and/or records constituting or pertaining to aircraft maintenance logbooks for aircraft associated with Civil Registration Number N29508 from January 1, 2017 to the present.

      f.   All audio recordings, photos, video recordings, and/or still captured images pertaining to any flights, accident, crash, condition, repair, recovery, removal, or destruction of or pertaining to a 1940 Taylorcraft, BL-65 aircraft associated with Civil Registration Number N29508.

      g.   All documents, data, and/or records pertaining to any Global Positioning System ("GPS") coordinates that identify any travel routes, destinations, origination points, or other locations for a 1940 Taylorcraft, BL-65 aircraft associated with Civil Registration Number N29508 for the period of January 1, 2021, to the present.

      h.   All records, data, and/or documents that indicate all stored or saved telephone numbers.

      i.   All records, data, and/or documents that consist of call log information, including all telephone numbers called from the SUBJECT DEVICE and all telephone numbers which called to the SUBJECT DEVICE for the period of January 1, 2021, to the present.

      j.   All SMS, text, and/or email communications sent to or received by the SUBJECT DEVICE for the period of January 1, 2021, to the present.

      k.   Data, records, or documents pertaining to FAA or NTSB regulations.

      l.   With respect to the SUBJECT DEVICE:

      i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted;

        ii.  evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

        iii. evidence of the attachment of other devices;

        iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

        v.  evidence of the times the device was used;

        vi.  applications, programs, software, documentation, manuals, passwords, keys, and other access devices that may be necessary to access the device or data stored on the device, to run software contained on the device, or to conduct a forensic examination of the device;

        vii. records of or information about Internet Protocol addresses used by the device.

    2.  As used herein, the terms "records," "information," "documents," "programs," "applications," and "materials" include records, information, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

    3.  As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal

digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; gaming consoles (including Sony
PlayStations and Microsoft Xboxes); peripheral input/output
devices, such as keyboards, printers, scanners, plotters,
monitors, and drives intended for removable media; related
communications devices, such as modems, routers, cables, and
connections; storage media, such as hard disk drives, floppy
disks, memory cards, optical disks, and magnetic tapes used to
store digital data (excluding analog tapes such as VHS); and
security devices.

I.    **SEARCH PROCEDURE FOR THE SUBJECT DEVICE**

4. In searching the SUBJECT DEVICE or forensic copies
thereof, law enforcement personnel executing this search
warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals
assisting law enforcement personnel (the "search team") will, in
their discretion, either search the SUBJECT DEVICE on-site or
seize and transport the SUBJECT DEVICE and/or forensic image(s)
thereof to an appropriate law enforcement laboratory or similar
facility to be searched at that location. The search team shall
complete the search as soon as is practicable but not to exceed
120 days from the date of execution of the warrant.  The
government will not search the SUJBECT DEVICE and/or forensic

image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

      b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

         i.   The search team may subject all of the data contained in the SUBJECT DEVICE to the search protocols to determine whether the SUBJECT DEVICE and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

         ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

         iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

      c.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

      d.   If the search team determines that the SUBJECT DEVICE does not contain any data falling within the list of items to be seized, the government will, as soon as is

practicable, return the SUBJECT DEVICE and delete or destroy all forensic copies thereof.

e.   If the search team determines that the SUBJECT DEVICE does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that the SUBJECT DEVICE is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the SUBJECT DEVICE and any forensic copies of the SUBJECT DEVICE, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain the SUBJECT DEVICE if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the SUBJECT DEVICE (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search the SUBJECT DEVICE because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the SUBJECT DEVICE, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to

law enforcement officers and agents, attorneys for the
government, attorney support staff, and technical experts.
Pursuant to this warrant, the investigating agency may deliver a
complete copy of the seized or copied electronic data to the
custody and control of attorneys for the government and their
support staff for their independent review.

     6. During the execution of this search warrant, law
enforcement is permitted to: (1) depress TREVOR JACOB'S thumb
and/or fingers onto the fingerprint sensor of the SUBJECT
DEVICE (only when the device has such a sensor), and direct
which specific finger(s) and/or thumb(s) shall be depressed;
and (2) hold the device in front of TREVOR JACOB'S face with
his eyes open to activate the facial-, iris-, or retina-
recognition feature, in order to gain access to the contents of
any such device.

     7. The special procedures relating to the SUBJECT DEVICE
found in this warrant govern only the search of SUBJECT DEVICE
pursuant to the authority conferred by this warrant and do not
apply to any search of digital devices pursuant to any other
court order.

## **AFFIDAVIT**

I, Cristina Jones, being duly sworn, declare and state as follows:

### I.  **INTRODUCTION**

1.    I am a Special Agent with the United States Department of Transportation, Office of Inspector General ("DOT-OIG"), and have been so employed since July 2019.  Previously, I was a Special Agent with the United States Department of Labor, Office of Inspector General, from February 2018 to July 2019.  I am assigned to the Western Regional Office in Cerritos, California, where I investigate matters concerning violations of Title 18 and Title 49 of the United States Code.  As a DOT-OIG Special Agent, I am responsible for investigating various types of fraud and safety violations related to DOT programs.

2.    I have completed three months of training at the Federal Law Enforcement Training Center in Brunswick, Georgia. During my employment as a DOT-OIG Special Agent, I have participated in investigations related to transportation safety, wire fraud, mail fraud, fraud against DOT programs, and various other DOT-related violations.  I have participated in various aspects of criminal investigations, including bank-record analysis, electronic surveillance, physical surveillance, search warrants, arrests, and reviewing evidence from digital devices.

### II. **PURPOSE OF AFFIDAVIT**

3.    This affidavit is made in support of an application for a warrant to search the person of TREVOR DANIEL JACOB

("JACOB"), who is more particularly described in Attachment A and to seize and search his mobile phone, namely an iPhone 12 Pro (the "SUBJECT DEVICE"), which is more particularly described in Attachment B.  Both Attachment A and Attachment B, which also describes the items to be seized under the requested search warrant, are incorporated herein by this reference.

  a. On January 28, 2022, I requested and received the California Department of Motor Vehicles photograph of DANIEL TREVOR JACOB via email from the California State Threat Assessment Center.  A copy of that photograph, which depicts a close-up of JACOB's face, is shown in Attachment A.  Along with the photograph, I also received information about JACOB's description which is set forth in Attachment A.

  b. On July 28, 2022, I visited JACOB's YouTube channel and screen grabbed a still image of JACOB from the YouTube video entitled, "I Crashed My Plane."  A copy of that image, which shows JACOB in an airplane, is also shown in Attachment A.

  4. The requested search warrant seeks authorization to seize evidence, fruits, instrumentalities, and evidence of violations of Title 18 U.S.C. § 32 (Destruction of Aircraft or Aircraft Facilities), 49 U.S.C. § 1155(b) (Aviation Penalties), 18 U.S.C. § 1505 (Obstruction of Proceedings before Department, Agencies, and Committees), and 18 U.S.C. § 1001 (False Statements) (collectively, the "Subject Offenses").

  5. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and

information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

6.   On or about November 24, 2021, JACOB acted as the pilot-in-command, and was the sole occupant, of a Taylorcraft BL-65, Civil Registration Number N29508 when the airplane was involved in an aviation accident in the Los Padres National Forest, located right outside of Santa Barbara County, California. JACOB reported that the airplane experienced an engine failure and he parachuted out of the airplane. The airplane crashed into in the Los Padres National Forest. JACOB recorded the accident on various cameras and uploaded a video documenting the accident on YouTube (https://www.youtube.com/trevorjacob). JACOB reported the accident to the FAA and NTSB and told both agencies that he did not know the location of the aircraft. However, on or about December 10, 2021, JACOB hired a helicopter pilot to remove the wreckage of the plane from the crash site.  On the same date, JACOB was seen on city cameras hauling the aircraft wreckage to Lompoc Airport. Even after December 10, 2021, JACOB continued to tell the NTSB and FAA that he did not know the location of the

aircraft, thus obstructing their investigations.  The FAA
determined that JACOB operated the flight to purposely cause the
airplane to crash and revoked JACOB's private pilot certificate.

## IV.   STATEMENT OF PROBABLE CAUSE

### A.   Background

7.   Based on my review of law enforcement reports, my
conversations with other experienced law enforcement agents, and
my personal participation in this investigation, I have learned
the following:

Relevant Statutes and Regulations

a.   Title 18, United States Code, Section 32(a),
provides that whoever willfully sets fire to, damages, destroys,
disables, or wrecks any aircraft in the special aircraft
jurisdiction of the United States or any civil aircraft used,
operated, or employed in interstate, overseas, or foreign air
commerce. Shall be fined under Title 18 or imprisoned for not
more than 20 years or both.

b.   Title 49 U.S.C. § 1155(b), states that a person
that knowingly and without authority removes, conceals, or
withholds a part of a civil aircraft involved in an accident, or
property on the aircraft at the time of the accident, shall be
fined under title 18, imprisoned for not more than 10 years, or
both.

c.   Title 18, United States Code, Section 1505,
provides that whoever, with intent to avoid, evade, prevent, or

obstruct compliance, in whole or in part, with any civil investigative demand duly and properly made under the Antitrust Civil Process Act, willfully withholds, misrepresents, removes from any place, conceals, covers up, destroys, mutilates, alters, or by other means falsifies any documentary material, answers to written interrogatories, or oral testimony, which is the subject of such demand; or attempts to do so or solicits another to do so, shall be fined under Title 18, imprisoned for not more than 5 years or both.

<u>National Transportation Safety Board</u>

      d.   The National Transportation Safety Board ("NTSB" or "the Board") is an independent federal agency charged by Congress with investigating every civil aviation accident in the United States and significant accident in other modes of transportation – highways, marine, pipeline, and railroad. The NTSB determines the probable cause of accidents and investigates and issues safety recommendations aimed at preventing future accidents.

      e.   Under title 49 CFR § 830.5, the operator of any civil aircraft, or any public aircraft not operated by the Armed Forces or an intelligence agency of the United States, or any foreign aircraft shall immediately, and by the most expeditious means available, notify the nearest NTSB office when an aircraft accident occurs.

      f.   Under title 49 CFR § 830.10, the operator of an aircraft involved in an accident or incident for which

notification must be given is responsible for preserving to the
extent possible any aircraft wreckage, cargo, and mail aboard
the aircraft, and all records, including all recording mediums
of flight, maintenance, and voice recorders, pertaining to the
operation and maintenance of the aircraft and to the airmen
until the Board takes custody thereof or a release is granted
pursuant to § 831.12(b) of this chapter.  Prior to the time the
Board or its authorized representative takes custody of aircraft
wreckage, mail, or cargo, such wreckage, mail, or cargo may not
be disturbed or moved except to the extent necessary: (1) To
remove persons injured or trapped; 2) To protect the wreckage
from further damage; or 3) To protect the public from injury.
(c) Where it is necessary to move aircraft wreckage, mail or
cargo, sketches, descriptive notes, and photographs shall be
made, if possible, of the original positions and condition of
the wreckage and any significant impact marks. (d) The operator
of an aircraft involved in an accident or incident shall retain
all records, reports, internal documents, and memoranda dealing
with the accident or incident, until authorized by the Board to
the contrary.

        Federal Aviation Administration

        g.   The Federal Aviation Administration ("FAA") is an
agency within the United States Department of Transportation
charged with ensuring the safety of aircraft operations in the
United States.  The FAA regulates all civilian aviation matters
in the United States and enforces the Code of Federal

Regulations within its jurisdiction.  The FAA investigates certain aircraft accidents to determine if the accident involved noncompliance with FAA statutes or regulations.

       h.   Title 14 CFR § 91.13(a) states no person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another.

**B.   NTSB Investigation**

      8.   On January 06, 2022, NTSB Attorney Benjamin Allen notified DOT-OIG by email that an aircraft accident occurred near the Los Padres National Forest in which the pilot claimed he experienced engine failure and parachuted out of the aircraft.  Allen's email further informed DOT-OIG that: (1) the pilot later uploaded a video of the accident on YouTube, (2) the pilot had retrieved the wreckage with the help of a helicopter pilot, and (3) the NTSB had concerns that the accident was staged as a stunt for YouTube and that the pilot potentially violated several statutes and regulations.

      9.   On January 6, 2022, NTSB Attorney Allen provided DOT-OIG with the DOT-OIG NTSB Form 6120.1 (Pilot/Operator Aircraft Accident/Incident Report) completed by JACOB.  The form was electronically signed by JACOB on November 30, 2021, and certified that the information provided on the form was complete and accurate to the best of his knowledge. I reviewed the report and learned that JACOB reported the following:

a.   The accident occurred on November 24, 2021, at 10:30 a.m. near Santa Maria, CA.  The aircraft involved was a 1940 Taylorcraft BL-65, registration number N29508.

b.   JACOB departed Lompoc airport on November 24, 2021, at approximately 9:45 a.m. and was headed to Mammoth to spread his best friend's ashes.  JACOB had intentions to stop in Tehachapi to re-fuel on his way to Mammoth.  At approximately 10:20 a.m., JACOB experienced a full loss of power and experienced an engine problem.  JACOB wrote that his plan was to glide and find a place to land.  JACOB wrote that he attempted a radio call to Santa Barbara Approach 124.15 to declare an emergency and heard no response.  After this, JACOB decided his best option was to jump from the plane and deploy his parachute.

c.   After landing, JACOB called his brother and explained what happened.  JACOB also called his friend, Kyle, and asked him to pick him at the corner of Rancho Tequsquet Road and Santa Maria Road in Santa Maria, California.  JACOB stated that he attempted to call 911 multiple times with no luck. JACOB found the aircraft and wrote that everything on the plane had disintegrated.

d.   JACOB continued to try climbing out of the area and, at approximately 7:30 p.m., he saw headlights in the distance.  The headlights belonged to JACOB'S friend "Kyle" and a rancher.  Kyle drove JACOB back to Lompoc.

10.  On May 23, 2022, I interviewed NTSB Senior Accident Investigator Eliott Simpson and learned the following:

      a.   Simpson spoke to JACOB via telephone on November 26, 2021.

      b.   JACOB told Simpson he lost engine power while flying from Lompoc to Mammoth to spread his friend's ashes. JACOB said he could not identify any landing options and bailed out at about 6,000 feet above ground level while wearing a parachute. JACOB stated that he sent a text message to a friend and did not call 911.  JACOB also stated that a rancher ultimately helped him out of the area.  JACOB video recorded the flight because he had a sponsorship.

      c.   JACOB told Simpson the aircraft was uninsured. Simpson told Jacob that because the aircraft was uninsured JACOB was responsible for preserving the wreckage and NTSB would need to see it.  Simpson told JACOB he should get a recovery strategy in place.  Simpson never gave JACOB a wreckage release form.

      d.   Simpson asked JACOB to determine the location of the crash and provide it to Simpson so that Simpson could give JACOB further instructions.  JACOB agreed to send Simpson the videos of the accident.  Simpson's primary focus during this phone call was identifying the location of the wreckage and obtaining the videos.

11. On February 1, 2022, NTSB Investigator Simpson provided me e-mails between him and JACOB. I reviewed those e-mails and learned the following:

      a.   On November 30, 2021, JACOB e-mailed Simpson the NTSB 6120.1 form.

b.   On January 3, 2022, Simpson e-mailed JACOB and asked if the wreckage had been recovered and if so, where it was located.   Simpson also requested copies of the airplane's logbooks and the original video footage.

c.   On January 04, 2022, JACOB e-mailed Simpson and wrote that he did not have the logbooks because they were in the plane at the time of the incident.   JACOB also wrote that he does not have full video clips.   In addition, JACOB wrote, "Also, I am not aware of the plane location." JACOB concluded the e-mail by asking Simpson to contact his attorney in the future.

12.   On January 05, 2022, the NTSB issued JACOB a subpoena for any and all items located in his hangar, specifically, Hangar 361, South Side Taxiway, Lompoc Airport, Lompoc, California or elsewhere related to the aircraft, the accident, the subsequent recovery, and/or the disposition of the aircraft. In response to this subpoena, the NTSB obtained seven microSD cards, one black Apple iPhone, one Makita angle grinder, and various debris.   NTSB attempted to extract data from the cards and prepared a report.   I reviewed the NTSB's corresponding report and learned that only one card appeared to show footage from the date of the accident.   This card had three clips showing the Taylorcraft airplane.   One clip is of the outside of the aircraft, a second clip is of an unknown individual walking around the aircraft while a second person appears to be sitting in the airplane, and a third clip is of JACOB talking into the camera saying he was flying to Mammoth to spread his friend's

ashes and promoting a pocket wallet known as "Ridge Wallet." This same card also contained deleted files that NTSB was able to recover.  The deleted files were recordings showing JACOB talking on the telephone with an individual I determined to be FAA Inspector Eric Burg based on Inspector Burg's corresponding report and my interview of Inspector Burg.  I listened to the recorded audio and learned the following:

a.  The video appears to start mid-conversation between JACOB and Burg.  During the call, JACOB says he is embarrassed and says he did not start a fire or hurt anyone and if that had happened he would not be able to live with himself. Inspector Burg says to JACOB that he does not have evidence of any violation on JACOB's part, which is a good thing, and JACOB agrees.

b.  JACOB says to Burg he intends to be a pilot for the rest of his life and that he would not break a law or intentionally do something wrong.  JACOB also says that he has worked too hard at earning his pilot's license to jeopardize it. JACOB says he wants to keep the skies safe and appreciates how difficult it was to get his pilot's license and if every average Joe was up in the skies, it would be a nightmare.

**C.   FAA Investigation**

13.  On May 25, 2022, I interviewed FAA Aviation Safety Inspector Eric Burg and learned the following:

a.   On about November 29, 2021, Burg received notification from the FAA Regional Operations Center of an accident involving JACOB.

b.   On December 02, 2021, Burg spoke to JACOB via telephone.  JACOB did not ask Burg for permission to record their conversation.  JACOB provided Burg by email the NTSB Form 6120 and told him that all the details of the accident were on the form. JACOB told Burg he was flying from Lompoc to Mammoth to spread his friend's ashes and, during the flight, JACOB decided to fly to Tehachapi to re-fuel.  JACOB told Burg that the engine quit and he could not identify any safe landing options so he parachuted out of the airplane, but he did not know at which altitude.  Burg asked JACOB why he did not follow any procedures to re-start the engine and JACOB said that he could not because the airplane required a hand prop start. After landing in the brush, JACOB said he called his brother to pick him up at the intersection of Rancho Tepusquet Road and Santa Maria Mesa Road. JACOB also said he called his friend, Kyle, and did not call 911.  JACOB said he walked for nine hours before he was picked up by his brother.  JACOB also told Burg that he had just purchased the airplane and it was "within annual."[1]  JACOB also said the logbooks were in the aircraft.

---

[1] I have learned from my work in this investigation that the phrase "in annual" suggests or means that the plane had a current airworthiness certificate.

c.    Burg later spoke to the previous owner of JACOB's airplane (N29508), Laurie Smith.  Smith told Burg that she sold the aircraft to JACOB out of annual.

d.    On December 24, 2021, JACOB e-mailed Burg the link to his YouTube video showing the accident.  After Burg received this e-mail, he initiated an enforcement investigation and the case was reassigned to FAA Principal Operations Inspector Scott Krantz.

14.  On January 24, 2022, FAA Principal Operations Inspector Scott Krantz provided me several records related to the FAA's investigation into JACOB's accident.  I reviewed those records and learned the following:

a.    An FAA Aircraft Bill of Sale for N29508, Taylorcraft BL65, serial number 2351 showed that, effective October 06, 2021, Laura Smith (seller) transferred ownership of the aircraft to JACOB (purchaser).  The sale price listed on the form was $5,000.

b.    An FAA Aircraft Registration Application for NC29508, Taylorcraft BL-65, serial number 2351 was filed by JACOB on October 13, 2021.

c.    Inspector Krantz provided me a report summarizing his conversation with the Lompoc Airport Manager Richard Fernbaugh.  Based on that report, dated January 3, 2022, I learned that JACOB was subleasing hangar #361 at Lompoc Airport from Central Coast Agriculture.

d.    Based on a report prepared by Inspector Krantz, I learned that on January 04, 2022, the Lompoc Airport Manager

Richard Fernbaugh opened hangar #361 and allowed Inspector
Krantz and FAA Inspector Steve Ratcliff into the hangar.  Krantz
saw and took photos of debris, a white pickup truck, white
aircraft fabric under the truck, a camera, sport parachute
altimeter, grinding tool, cell phone, go Pro cases, a bag of
what JACOB called his friend's ashes, and video editing
equipment. Krantz did not see the aircraft logbooks.

      e.   Krantz provided me a report summarizing his
interview of helicopter pilot Scott Sinton on January 04, 2022.
After reviewing that report, I learned that on December 10,
2021, Sinton assisted JACOB in recovering his wrecked aircraft
from the forest.

      f.   On January 05, 2022, Sinton provided Krantz a
written statement via e-mail. I reviewed the statement and
learned the following: (1) JACOB called SINTON a few days before
December 10, 2021, to lift his wrecked Taylorcraft airplane out
of the forest; (2) JACOB said he was cleared to salvage the
plane; (3) On December 10, 2021, Sinton flew his helicopter and
met JACOB and a friend at Rancho Siquoc (Santa Maria,
California); (4) Sinton flew JACOB and his friend to the
wreckage and dropped them off with straps and shackles; (5)
Sinton landed in an open field nearby, put on the helicopter
long line and returned to the wreckage site; (6) Sinton hooked
onto the plane and flew it to JACOB's trailer; (7) Sinton sent
JACOB an invoice for $4,950; and (8) On December 31, 2021,
JACOB's friend "Steve Dozier" paid Sinton $5,000 on behalf of
JACOB.

g.   Inspector Krantz provided me an invoice he obtained from Sinton.  The Sinton Helicopter invoice was dated December 15, 2021, and was addressed to JACOB showing a total amount of $4,945 for "Airplane Lift."

h.   On May 31, 2022, I interviewed Sinton via telephone. Sinton confirmed the details provided in his statement.  Sinton also said that JACOB told him he had permission to recover the aircraft from NTSB or FAA but Sinton could not recall JACOB's exact words.  Sinton added that he first met JACOB about three years ago when JACOB skydived out of Sinton's helicopter.  Sinton knew JACOB to be an adrenaline junkie who was previously part of a group that performed extreme stunts.  I asked Sinton how they knew where to find the airplane and he responded that JACOB remembered where the airplane was.

i.   Inspector Krantz provided me video footage from Lompoc city cameras he obtained from the Lompoc Police Department.  I reviewed the videos and the corresponding Lompoc Police Department report and learned that, on December 10, 2021, at approximately 2:46:05 p.m., a city camera located at approximately 1620 North H Street captured a white pickup truck with California License plate 26225ER (registered to JACOB) towing a trailer with what appeared to be a wrecked white aircraft.  A second white pickup truck with California license plate 81461BA (registered to Nicholas Castillo) followed closely behind.  Both trucks were headed North and entered into a left turning lane that leads to the Lompoc Airport.  A second video from the Lompoc Airport East Parking Lot showed the same white

truck towing the airplane on a trailer and the second white truck following behind entered the parking lot at approximately 02:46:33 p.m.

j. On January 6, 2022, Inspector Krantz received a written statement from Pilot Ed Mandibles via e-mail. I reviewed the statement and learned that on December 10, 2021, Mandibles witnessed two pickup trucks enter the airport. One truck was towing an "obviously crashed white fabric aircraft on the trailer." Mandibles did not know the identity of the drivers. About four days after December 10, 2021, Mandibles observed that the four trash receptacles near the North side gate of the airport were all completely full of fabric airplane parts that had been cut up and stuffed into the receptacles. A few days later, the receptacles were full again.

k. On January 7, 2022, Inspector Krantz received a written statement from Mackenzie Clarke via e-mail. I reviewed the statement and learned the following:

i. Clark met JACOB approximately two months prior to January 2022. Shortly after meeting him, Clark saw JACOB's Taylorcraft N29509. Clark saw JACOB working on the airplane and assisted him by providing a tool kit, performing taxi tests, and test flights on the aircraft.

ii. JACOB told Clark he was going to relocate the airplane to Mammoth because his father had a hangar there. Clark told JACOB to address several issues with the aircraft prior to flying to Mammoth. JACOB dismissed Clark's suggestions

16

and said it would be fine.  Clark found this odd because JACOB
spared no expense maintaining his other aircraft.

       iii. On an unknown date, Clark saw the airplane
depart Lompoc airport.  Clark sent JACOB a text message and
asked him if he was flying to Mammoth.  Jacob responded that he
was and Clark told him to him to fly safe.  Clark found it odd
that the plane was flying towards Santa Ynez since a flight to
Mammoth would be in a more northern direction.  Later that day,
he saw JACOB return to the Lompoc airport. JACOB told Clark the
fuel indicator had gotten very low so he returned to Lompoc
airport.  Clark offered to follow JACOB on his flight to Mammoth
to ensure he got there safely and JACOB was adamant that Clark
not follow him.  Clark noticed that JACOB was wearing a
parachute.  JACOB said if he had any problems he would just jump
out of the airplane.

       iv. A day or two later, Clark saw JACOB depart
again.  The following day, Clark saw JACOB and JACOB told him he
had been flying to Mammoth when the engine quit so he bailed
out.  Clark wrote that JACOB was "smiling and seemingly holding
back laughter as he told me this."  JACOB told Clark he got it
all on video and that he notified the FAA and NTSB.  Clark told
JACOB that it would likely be his responsibility to remove the
aircraft and gave him a helicopter pilot's phone number. JACOB
later told Clark that he spoke to that helicopter pilot and he
was unable to help him.

       v.  During a later conversation a few days
later, JACOB told Clark that he knew exactly where the wreckage

was but did not want the FAA or NTSB to see it.  JACOB told
Clark he sent his coordinates to his friend in Santa Barbara
after the crash and his friend picked him up from a road near a
dry riverbed.  JACOB bragged about how well he deceived the FAA
official over the phone and made him believe that he did not
know where the wreckage was and that the logbooks were in the
airplane.

       vi.  JACOB told Clark he filmed the flight for a
sponsorship deal with a wallet company.  JACOB said his friend
had a helicopter that would help him remove the wreckage.  JACOB
planned to send the video to the FAA and post the video on
YouTube after the wreckage was removed.  JACOB said the wreckage
would be long gone if anyone went looking for the wreckage.

       vii. JACOB never told Clark he crashed the
airplane on purpose, but Clark believes the crash was
intentional.

       viii.   Clark also wrote that, after the crash,
JACOB showed him the airplane's engine inside of JACOB's hangar.
Clark also saw the cut-up wreckage inside JACOB's truck bed.
JACOB asked Clark if he knew anyone that would buy the engine
and Clark told him he did not.

       l.  Inspector Krantz provided me a receipt he
obtained from the company Ridge Wallet.  The receipt showed an
$8,000 payment to JACOB for the sponsored ad shown on JACOB's
YouTube video.

       m.  Based on my review of Inspector Krantz' final
investigative report, I learned that on January 26, 2022,

Inspector Krantz participated in a reconnaissance flight with the Santa Barbara County Sheriff's Department to the crash site over the Los Padres National Forest. Inspector Krantz identified "numerous areas that Mr. Jacob could have safely landed his Taylorcraft N29508 in an emergency with an engine failure."

n.   On April 11, 2022, the FAA issued JACOB an emergency order of revocation for his private pilot certificate. In that emergency order indicates that: (1) Based on its investigation, the FAA found that JACOB violated 14 CFR § 91.13(a) (careless or reckless operation) when, on or about November 24, 2021, JACOB acted as the pilot-in-command of a 1940 Taylorcraft BL-65, Civil Registration Number N29508; and (2) JACOB operated the flight to purposely cause aircraft N29508 to crash.  The emergency order further indicated that the FAA based its finding that JACOB purposely crashed the aircraft on the fact that: JACOB attached multiple cameras on the airplane prior to the flight, JACOB put on a sport parachute prior to the flight, JACOB opened the left side pilot door before he claimed the engine failed, JACOB made no attempt to contact air traffic control, JACOB made no attempt to restart the engine, JACOB made no attempt to look for areas to land safely even though there were multiple areas within gliding range in which he could have made a safe landing, JACOB jumped out of the airplane while holding a camera attached to a selfie stick and continued to record the aircraft during his descent, JACOB recovered and disposed of the wreckage of aircraft N29508, and that JACOB

19

recovered the cameras he attached to the airplane prior to the flight.

    **D.**   **YouTube Video**

   15.  Between January 2021 and June 28, 2022, I visited Trevor Jacob's YouTube channel (www.youtube.com/trevorjacob) on numerous occasions. I identified at least three versions of JACOB's YouTube video capturing the accident. The original version was uploaded on or about December 23, 2021. The current version published on JACOB's YouTube channel is approximately four minutes shorter than the first version. The subsequent versions of the video appear to show all the same footage as the original version with some exclusions. Subsequent versions of the video exclude footage of JACOB promoting the Ridge Wallet and footage of JACOB a few days after the accident, as shown in the original video. As of June 28, 2022, the video published on JACOB's YouTube channel titled "I Crashed my Plane" has approximately 2.6 million views. I reviewed the original version of the video and observed the following:

      a.  JACOB starts the video with a preview of the accident followed by clips of white text on a black background that read the following:

          "On November 24th, 2021, I took off to the Sierra Nevada Mountains to spread my best friend Johnny Stranges ashes. I planned to document the entire trip and make a video sharing the adventure. During the flight I experienced an engine failure over some

mountains. There was no safe place to land. I jumped

from the plane and deployed my parachute. I notified

the FAA and the NTSB immediately. I didn't think I

would have the courage to share this footage, but I

feel a lot of pilots can learn from my experience.

Please fly with a parachute."

This portion is excluded from the version of the video currently
published on JACOB's YouTube channel.

b.    JACOB starts the original version of the video by
saying he is flying the 1940 Taylorcraft aircraft to Mammoth to
do some paragliding, snowboarding, and to spread his friend's
ashes.  Jacob shows and describes the Ridge Wallet.  This
portion of the video is excluded from the version of the video
currently published on JACOB's YouTube channel.

c.    The next clip of the original version of the
video shows JACOB flying in an airplane and appearing to takeoff
from an airport.  Approximately three minutes into the video,
JACOB says he's over the mountains and has an engine out.  JACOB
opens and closes the left side pilot door.  JACOB jumps out of
the airplane and the angle of the video alternates between a
camera he is holding in his hand as he descends and cameras
attached to the airplane.  JACOB deploys his parachute.  The
airplane crashes into the mountains.

d.    JACOB lands in the brush and at one point JACOB
says, "I'm just so happy to be alive, I'm just kind of taking in
what just happened, where the hell am I going to land a freaking

plane I'm gonna die, that's why I always freaking fly with a parachute."

      e.   The original version of the video shows JACOB walking back to the wrecked plane.  The rest of the video shows JACOB hiking out of the area.  JACOB finds a creek and drinks water.  Shortly after, headlights appear near JACOB and then JACOB is talking to at least one unknown individual.  A black screen flashes that reads, "Thank you to the farmers who saved me."

      f.   In the next clip of the original version of the video, JACOB says it's been a few days since the crash and he is on a drive to spread his friend's ashes in the Sierra Nevada mountains.  The video then shows JACOB in the mountains appearing to spread ashes over the mountains and then proceeds to paraglide off the mountain. This portion is excluded from the version of the video currently published on JACOB's YouTube channel.

    **E.   Use of the Subject Device**

   16.   JACOB identified his phone number to the FAA and NTSB as (760) XXX-2621.  On May 30, 2022, I received subscriber information and toll records associated with phone number (760) XXX-2621.  I reviewed those records and learned the following:

      a.   The user associated with the phone number is Lynn Jacob.  Based on a search of a law enforcement database used to identify witness contact information, I learned that Lynn Jacob is listed as a possible relative of JACOB's.

b.   The device associated with the phone number at the time of the accident in November 2021 is the SUBJECT DEVICE (iPhone 12 Pro IMEI 3509058239557400).

c.   On the date of the accident, November 24, 2021, the phone number associated with the SUBJECT DEVICE was used to make several phone calls throughout the day, including to phone number (805) XXX-8230.  Based on a search of a law enforcement database used to identify witness contact information, I believe that the (805) XXX-8230 phone number belongs to Nicholas Castillo, the same individual whose car was seen following JACOB after recovering the wrecked aircraft on December 10, 2021.

d.   On the date of the accident, the phone number associated with the SUBJECT DEVICE also sent and received a total of approximately 45 text messages.

e.   On December 10, 2021, the date the aircraft wreckage was removed, the phone number associated with the SUBJECT DEVICE was used to make and receive several phone calls throughout the day, including at least three phone calls to the phone number associated with Nicholas Castillo. On December 09, 2021, the phone number associated with SUBJECT DEVICE called the phone number helicopter pilot Sinton provided me when I interviewed him.

f.   On December 10, 2021, the phone number associated with the SUBJECT DEVICE sent one text message and received three text messages, including one text message received from the phone number associated with Nicholas Castillo.

g.    The most recent use of the phone number associated with the SUBJECT DEVICE, based on records provided to me through May 30, 2022, was on May 24, 2022.

**F.    Training and Experience on Digital Devices**

17.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are

24

not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

> c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

> d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

18.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

> a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel

25

may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

    b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

    19.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

    a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

26

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcode of the device likely to be found in the search.

c.    Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress TREVOR JACOB's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of TREVOR JACOB'S face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

20.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## V.  <u>CONCLUSION</u>

21.  For all the reasons described above, there is probable cause to believe that evidence, fruits, and instrumentalities of violations of the Subject Offenses, as described in Attachment B to this affidavit, will be found in a search of the SUBJECT DEVICE, which is more fully described in Attachment B, and that

the SUBJECT DEVICE will be found on JACOB, who is more fully
described in Attachment A.



Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this ___ day of
August, 2022.

_____
HONORABLE STEVE KIM
UNITED STATES MAGISTRATE JUDGE